FILED

04/05/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2018 Session

**STATE OF TENNESSEE v. MARCUS K. WILLIAMS AND COREY
ZIMBERLIST RUTLAND, JR.**

**Appeal from the Criminal Court for Davidson County
No. 2015-C-1928    Cheryl A. Blackburn, Judge**

_____

**No. M2017-00509-CCA-R3-CD**

_____

Defendants, Marcus K. Williams and Corey Zimberlist Rutland, Jr., were indicted for aggravated robbery, attempted aggravated robbery and aggravated assault. Defendant Williams was also indicted for aggravated burglary. After a jury trial, Defendants Williams and Rutland were convicted of aggravated robbery and aggravated assault, and Defendant Williams was convicted of aggravated burglary. At a sentencing hearing, Defendants Williams and Rutland received identical sentences of eleven years for aggravated robbery and five years for aggravated assault. Defendant Williams received a five year sentence for aggravated burglary. On appeal, Defendant Williams challenges the sufficiency of the evidence for his aggravated robbery charge. Defendant Rutland argues that the trial court improperly excluded the content of a phone call between Defendant Rutland and Defendant Williams, that the evidence was insufficient to support his convictions under a theory of criminal responsibility, and that his sentence is disproportionate and excessive. Finding that the only error by the trial court was harmless, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J. and ROBERT L. HOLLOWAY, JR., J., joined.

Jay Umerley, Nashville, Tennessee, for the appellant, Marcus K. Williams.

Jessica M. Van Dyke, Nashville, Tennessee for the appellant, Corey Zimberlist Rutland, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Glenn R. Funk, District Attorney General; and Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

A Davidson County Grand Jury indicted Defendant Williams for one count of aggravated burglary and Defendants Williams and Rutland for aggravated robbery, attempted aggravated robbery, and aggravated assault. Prior to trial, the State chose to nolle prosequi Count Three, attempted aggravated robbery. A trial was held on the remaining counts. The following narrative of events is derived from the consistent testimony of the State's witnesses at trial.

Robert Anderson, Michele Howard, and their one-year-old son lived in Room 146 at the Congress Inn. For a period of time, Defendants Rutland and Williams lived next door in Room 145. Mr. Anderson saw the Defendants almost every day. On June 1, 2015, Mr. Anderson and Ms. Howard got into an argument. The volume of this argument prompted Defendant Williams to knock on their window and ask them to "keep it down" because they were "keeping his daughter awake." Ms. Howard told Defendant Williams to get away from the window and called him a "peeping Tom." Mr. Anderson recounted that Defendant Williams walked up to the door and shoved it open with his shoulder in response to Ms. Howard's statement. Once in the room, Defendant Williams raised his hand as if he was going to hit Ms. Howard, but Mr. Anderson intervened to stop him. Mr. Anderson said, "He didn't actually throw a punch, but he made the gesture." Ms. Howard explained Defendant Williams tried to "swing" at her. Ms. Howard thought that Defendant Williams was going to try to hit her. However, she stated that he did not make contact. Mr. Anderson demonstrated the action by holding his arm up at shoulder level and pushing his arm forward as if he were going to punch but did not make a full punching motion. At the time that Defendant Williams made this motion, he was partially inside the room, but his right leg was still outside the door. Mr. Anderson was concerned that Defendant Williams would strike Ms. Howard. When he intervened, Mr. Anderson told Defendant Williams that he "wasn't going to fight him," and Defendant Williams walked away.

After this altercation, Mr. Anderson and Ms. Howard placed their son in the car and went on a search for houses. Around this time, Mr. Anderson saw Defendant Rutland arrive at the Congress Inn. Once Mr. Anderson and Ms. Howard returned in the afternoon, Mr. Anderson and Ms. Howard noticed Defendants Williams and Rutland outside. At this time, Defendant Williams was smoking a cigarette, and Defendant Rutland was standing at the door for Room 145. As typical, Mr. Anderson backed his white Cadillac into a parking spot. Mr. Anderson and Ms. Howard sat in the car for a short period of time before Ms. Howard got out and opened the rear door of the car to get their son out of the back seat. Mr. Anderson walked to the door of Room 146 to unlock it, and Defendant Williams walked up behind him.

The encounter escalated when Defendant Williams pulled out his gun and put it to Mr. Anderson's head. Mr. Anderson recalled Defendant Williams saying, "[G]ive me your money." Defendant Williams had a silver revolver that Mr. Anderson could see was fully loaded. When Mr. Anderson felt the gun touch him, he tried to smack the gun out of Defendant Williams's hand. Defendant Williams attempted to dig into Mr. Anderson's pockets but was unsuccessful. Eventually, Mr. Anderson reached into his pockets and gave around $420 to Defendant Williams. Defendant Williams also took Mr. Anderson's car keys. After taking the items, Defendant Williams waived the gun around and pointed it at Ms. Howard while she held the one-year-old child before he backed off and walked away. Ms. Howard was scared for the life of her son and herself when Defendant Williams pointed the gun at them.

While Defendant Williams held Mr. Anderson at gunpoint, Defendant Rutland approached Ms. Howard and said "give me your phone" and "don't call the police." Ms. Howard had her phone in her hand and put it in her back pocket. Ms. Howard thought about calling the police, but refrained when Defendant Rutland asked for her phone. Ms. Howard's first instinct was to go to the front desk at the hotel and summon help, but she was prevented from doing so when Defendant Rutland walked into her path and told her not to move. After Defendant Rutland cut her off, Ms. Howard went back to the car to put her son inside the car to keep him safe. However, Defendant Rutland shut the car door and prevented Ms. Howard from getting inside the vehicle. This is contrary to Mr. Anderson's recollection that Ms. Howard got into the passenger's seat of the car. Ms. Howard admitted that Defendant Rutland did not place his hands on her, but she claimed that he was less than two feet away from her. Ms. Howard could not recall overhearing any communication between Defendant Williams and Defendant Rutland. Both Defendants walked away at the same time.

Once Defendants were gone, Mr. Anderson, Ms. Howard, and their child went inside their room. At that point, the police were called. Moments after getting inside the room, Mr. Anderson saw Defendants Williams and Rutland leave. Ms. Howard recalled

Defendant Rutland leaving in a different vehicle from Defendant Williams. Mr. Anderson did not specify. In order to determine the full names of the Defendants, Ms. Howard looked them up on Facebook. Mr. Anderson and Ms. Howard independently identified Defendant Rutland and Defendant Williams in a photographic line-up.

Detective Jack Stanley of the Metropolitan Nashville Police Department was dispatched to the Congress Inn and was met there by Officer Joshua Reece. Officer Reece briefed Detective Stanley on the incident and then Officer Reece spoke with Mr. Anderson, Ms. Howard, and Shanquita Jeter. Detective Stanley stated that the witnesses were able to identify the perpetrators by their first names immediately when he spoke with them. After speaking with the witnesses, Detective Stanley retrieved the surveillance footage from the Congress Inn. When Detective Stanley inquired about who had rented room 145, he obtained a handwritten receipt as well as photocopies of the driver's licenses of Defendant Williams and Shanquita Jeter. Detective Stanley testified that between $400 and $420 in addition to a set of car keys were taken from Mr. Anderson, but neither the money nor the keys were recovered.

Defendant Williams chose to testify on his own behalf. He stated that he lived in room 145 at the Congress Inn with Ms. Jeter, his daughter, and Defendant Rutland. Mr. Anderson and Ms. Howard lived next door, and within the first few weeks of moving to the Congress Inn, Defendant Williams began having issues with the noise coming from Mr. Anderson and Ms. Howard's room. Defendant Williams could "constantly hear the arguing and fighting as if someone was yelling . . . . [T]he wall would be shaking where . . . my head was at." He said, "It prevented me from sleeping, it prevented me and my daughter from sleeping, it prevented me from having peace. It agitated me, and it angered me." Defendant Williams recalled asking Mr. Anderson and Ms. Howard to keep the noise down, but nothing changed.

Defendant Williams stated that, on the day of the crimes, he went to the window of Room 146 to ask Mr. Anderson and Ms. Howard to be quiet. At this point, Ms. Howard made a statement that Defendant Williams perceived as a threat. He indicated that this threat was a statement that did not include the words "peeping Tom." Defendant Williams went back to his room. Later, he returned to Room 146. This time Defendant Williams stated that he simply opened the door. According to Defendant Williams, the door was unlocked and he opened it by simply turning the handle. Once the door was open, Defendant Williams said, "If you thought Mr. Anderson was beating your a**, I would knock your a** out." At that point, Mr. Anderson stepped toward Defendant Williams. Upon review of the video, Defendant Williams noted that his arm was cocked back in response to the arguing with Mr. Anderson and Ms. Howard. Defendant Williams stated that there was not a physical altercation between him and Mr. Anderson or Ms. Howard. Once he exited their room, he went back to his room.

- 4 -

On cross-examination by the State, Defendant Williams admitted that he entered Mr. Anderson and Ms. Howard's hotel room without permission and drew his arm back as if he were going to throw a punch. However, Defendant Williams maintained that he never threw a punch, but only jerked or cocked his arm back. Defendant Williams admitted that it was his intent to intimidate Mr. Anderson and Ms. Howard when he cocked his arm back.

With regard to the second encounter, Defendant Williams described the events that occurred as follows:

> Mr. Anderson pulls up in his vehicle. He backs his car in. I'm standing outside of my room. I wait for Mr. Anderson to get out of his car. I walk over to Mr. Anderson, and I state to him, what are we going to do about the noise. That I asked him, I said, what is that s**t you're talking. He looks at me like . . . he doesn't even care. I then pulled the weapon from my hip, and I pointed the weapon at Mr. Anderson's head. And I threatened him.

Defendant Williams denied taking anything from Mr. Anderson. Defendant Williams admitted that he had made a mistake and maintained that he did not intend to hurt anyone. Rather, his intention was to scare Mr. Anderson and Ms. Howard.

During a review of the video of the second altercation during the State's cross-examination, Defendant Williams admitted that he changed his position relative to Mr. Anderson, but denied reaching into Mr. Anderson's pocket. Defendant Williams also denied any type of exchange or acceptance of anything from Mr. Anderson. Defendant Williams admitted to pointing the firearm at Ms. Howard while she was holding her one-year-old son. However, he said that this was in reaction to her making statements toward him. At the time that he pointed the firearm at Ms. Howard, Defendant Williams agreed that Defendant Rutland was standing beside her. When speaking about the vehicles leaving the scene, Defendant Williams stated that Defendant Rutland was inside the SUV with him. He stated that the individual leaving in the white car was a different individual that was in his room.

On cross-examination by Defendant Rutland's counsel, Defendant Williams stated that Defendant Rutland was Ms. Jeter's brother. Thus, Defendant Williams's and Ms. Jeter's daughter would be Defendant Rutland's niece. Without objection, Defendant Rutland's counsel engaged in the following exchange with Defendant Williams:

> Q.     And did you call and ask him to come over that day?

A.    Yes. I had called Mr. Rutland to ask him could he come and get [Defendant Williams's daughter].

. . . .

Q.    You said, will you come and get [Defendant Williams's daughter]?
A.    Yes, I did.
Q.    What did you say?
A.    I called Mr. Rutland, and I stated to him that he should come get my daughter because I felt that something was fixing to happen.
Q.    And were you referencing something with the neighbors?
A.    Yes, I was.

Further cross-examination revealed that Defendant Williams did not tell Defendant Rutland about his intentions when confronting Mr. Anderson and Ms. Howard.  Additionally, Defendant Williams claimed that he did not tell Defendant Rutland about the gun.  Defendant Williams maintained that he did not instruct Defendant Rutland to do anything nor did he ask for Defendant Rutland's help.  He did not recall any communication between himself and Defendant Rutland prior to the crime. Defendant Williams revealed that he did not know the reason for Defendant Rutland's actions during the altercation.

Rachel Blair-Nash testified during Defendant Rutland's case-in-chief.  Ms. Blair-Nash, Defendant Rutland's ex-girlfriend, testified that she and Defendant Rutland were watching television at their apartment when Defendant Rutland received a phone call from Defendant Williams.  Ms. Blair-Nash brought up the phone call in response to the question "[D]o you recall what happened that led you to go to the Congress Inn that day?"  The trial court immediately sustained an objection to what was said during the phone call, but Ms. Blair-Nash testified that in response to the phone call, she, her two children, and Defendant Rutland went to the Congress Inn to pick up "the baby."

Upon arrival at the Congress Inn, Ms. Blair-Nash stayed in her car to make some phone calls, but Defendant Rutland went inside a hotel room.  After a few moments, Ms. Blair-Nash and her children joined Defendant Rutland in the room.  Defendant Williams arrived a bit later and had his daughter with him.  After some conversation, Defendants Williams and Rutland exited the hotel room.  Not long after they exited, Ms. Blair-Nash looked out the window to see Defendant Rutland's location.  At that point, Ms. Blair-Nash observed him talking to Defendant Williams's "female neighbor."  Ms. Blair-Nash was ready to leave and got her children ready to go.  Soon, Defendant Williams entered the room, and then Ms. Blair-Nash and her children left with Defendants Williams, Defendant Williams's daughter, and Defendant Rutland.

At no point did Ms. Blair-Nash hear Defendants Williams and Rutland talk about illegal activity. She never saw either of them with a gun. She also did not receive any money from Defendant Rutland nor did she observe any money changing hands.

After the testimony of Ms. Blair-Nash, Defendant Rutland took the stand and recounted going to the Congress Inn to pick up his niece after receiving a phone call from Defendant Williams. Defendant Rutland's counsel asked, "[W]hat caused you to initially go to the Congress Inn that day?" Before Defendant Rutland was able to state the content of the phone call, the State objected saying merely, "object to what Mr. Williams said," and the trial court sustained the objection without hearing any argument or response from the Defense. Defendant Rutland also talked about a second phone call that he made to Defendant Williams while at the Congress Inn. Defendant Rutland brought up this phone call in response to his counsel asking, "[W]hy was it that you were going to wait?" As Defendant Rutland began to mention the content of that phone call in his explanation as to why he did not leave the Congress Inn, the State said, "Objection," and the trial court told Defendant Rutland, "Do not say what someone else says, okay?" Defendant Rutland's counsel again inquired as to why Defendant Rutland stayed at the Congress Inn and he replied, "I came to get my niece."

Defendant Rutland explained that he went into Defendant Williams's room at the Congress Inn to await Defendant Williams's arrival. Eventually, Ms. Blair-Nash and her children joined him. After a few minutes, Defendant Williams arrived at the hotel room with his daughter. Defendants Williams and Rutland talked and smoked a cigarette together outside before Mr. Anderson and Ms. Howard arrived. As Mr. Anderson and Ms. Howard arrived, Ms. Blair-Nash told Defendant Rutland that she was ready to leave. So, he responded by telling her to get the children ready. At this point, Defendant Rutland was standing at the door.

Next, he observed Ms. Howard get out of a vehicle and go to the back door. All the while, he also saw Defendant Williams approach Mr. Anderson and begin speaking to him. During that conversation, Defendant Williams pulled out a gun. Defendant Rutland had no knowledge that Defendant Williams owned or possessed a firearm. In reaction to Defendant Williams's drawing of the firearm, Defendant Rutland instinctively walked toward Ms. Howard. No one told Defendant Rutland to do this. Rather, he claimed it was his reaction. Upon approaching Ms. Howard, Defendant Rutland asked for her phone. In response, Ms. Howard placed the phone behind her back. At no point did Defendant Rutland touch Ms. Howard. However, Defendant Rutland touched the car when he shut the car door. Defendant Rutland admitted that he walked in front of Ms. Howard when she attempted to walk away. He further admitted that he asked for her

phone to prevent her from calling the police because he did not want to be arrested nor did he want to see Defendant Williams arrested.

Defendant Rutland was aware that Defendant Williams had conflicts with his neighbors, but he knew neither that the conflicts had risen to this level of intensity nor that this altercation would occur. Defendant Rutland never saw any money taken from Mr. Anderson. He did not receive any money. Once Defendants Williams and Rutland left the Congress Inn, they did not speak about what had just occurred. Defendant Rutland admitted that he lied to the police when he initially told them that Defendant Williams did not have a gun.

On cross-examination, the State was allowed to question Defendant Rutland on the content of a phone call between him and Defendant Williams which the trial court barred from admission on direct examination. Defendant Rutland's Counsel objected and protested that the statements were previously ruled to be hearsay. However, it appears that the trial court determined that the Defense had portrayed Defendant Rutland as someone without knowledge that there was a problem and that the statement made in the police interview which disclosed the content of the telephone call was admissible for impeachment purposes. Thereafter, Defendant Rutland admitted that he told the police in his interview that Defendant Williams told him "something going on, fixing to go down, fixing to go down." In addition to his statements to the police about the phone call, the State cross-examined Defendant Rutland on numerous statements that he made to the police which he admitted were untruthful. Defendant Rutland also admitted that he understood the phrase "something is going down" as meaning there was about to be a fight. On re-direct examination, Defendant Rutland's counsel questioned him about the phone call referenced by the State on cross-examination and its contents.

During Defendant Rutland's counsel's closing argument, she commented on the content of the phone call when she said the following:

> I think it's really important to point out that Mr. Rutland fully admits to you, I got a phone call that day, I knew I needed to go pick up Baby Jade, I was told that something was fixing to go down, I didn't know anything else. He had no idea of what was about to ensue.

Defendant Rutland's counsel further referenced the content of the phone call when she said, "You have no proof before you that he had any knowledge of that other than the nonspecific statement that something is fixing to go down."

After deliberation, the jury found Defendant Williams guilty of one count of aggravated burglary and both Defendants Williams and Rutland guilty of one count of aggravated robbery and one count of aggravated assault.

At the sentencing hearing, Defendant Williams testified and Defendant Rutland gave a short allocution expressing remorse. The trial court found that four enhancement factors listed in Tennessee Code Annotated section 40-35-114 applied to Defendant Williams. The trial court applied enhancement factor one that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; enhancement factor two that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; enhancement factor three that "[t]he offense involved more than one (1) victim"; and enhancement factor eight that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." *See* T.C.A. § 40-35-114(1),(2),(3),(8). After finding that no mitigating factors applied and that Defendant Williams was not a candidate for consecutive sentencing, the trial court sentenced Defendant Williams to five years on Count One, aggravated burglary, eleven years at eighty-five percent on Count Two, aggravated robbery, and five years on Count Four, aggravated assault.

The trial court found that four enhancement factors applied to Defendant Rutland. The trial court applied enhancement factors one, three, and eight as listed above. Additionally, the trial court applied enhancement factor thirteen, which states "At the time the felony was committed . . . the defendant . . . [was] [o]n any other type of release into the community under the direct or indirect supervision of any state or local governmental authority . . . ." T.C.A. § 40-35-114(13)(G). After finding that no mitigating factors applied and that Defendant Rutland was not a candidate for consecutive sentencing, the trial court sentenced Defendant Rutland to eleven years at eighty-five percent on Count Two and five years on Count Four.

Both defendants filed timely motions for new trial presenting the same issues as presented on this appeal. The trial court denied both motions for new trial and this appeal followed.

*Analysis*

*I. Hearsay*

Defendant Rutland argues that the trial court erred when it excluded the content of Defendant Williams's phone call conversation with Defendant Rutland during Defendant Rutland's direct examination because the exclusion of the content of the phone call

denied Defendant Rutland the ability to present a defense and the content of the phone call was non-hearsay. The State responds by arguing that the trial court properly sustained the State's two hearsay objections and that Defendant Rutland was not deprived of the opportunity to present a defense. While we do not completely agree with either party, we discern no reversible error by the trial court.

In our analysis of this issue, we first turn to whether the trial court made the proper evidentiary ruling. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is inadmissible absent an applicable exception. Tenn. R. Evid. 802. However, out-of-court statements offered to show the effect on the listener, but not the truth of the matter asserted, are admissible as definitional non-hearsay. *See* Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence, § 8.01[7] (4th ed. 2000).

"The standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). First, a trial court must determine if a statement is hearsay. *Id.* If the statement is hearsay, then the trial court must determine if it fits within one of the exceptions. *Id.* A trial court may need to receive evidence and hear testimony to make these determinations. *Id.* The trial court's factual and credibility findings made during the course of ruling on an evidentiary motion "are binding on the reviewing court unless the evidence in the record preponderates against them." *Id.* "Once the trial court has made its factual findings, the next questions — whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule — are questions of law subject to de novo review." *Id.* (citing *State v. Schiefelbien*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

The record of the trial proceedings is filled with discussions amongst the trial court, the State, and both defense attorneys about various statements being hearsay, the definition of hearsay, and hearsay exceptions. In order for a statement to be hearsay, it must meet two requirements. *See* Tenn. R. Evid. 801(c). First, it must be "a statement, other than one made by the declarant while testifying at the trial or hearing." *Id.* Second, and most importantly for this case, the statement must be "offered in evidence to prove the truth of the matter asserted." *Id.*

With every hearsay objection, there must be a determination by the trial court of whether the statement which is the subject of the objection meets the two parts of the hearsay definition. Though we do not know the exact content of the entire phone call because no offer of proof was made by Defendant Rutland's counsel, the record does reveal portions of the content of the phone call. The record reveals part of the phone call

included Defendant Williams *asking* Defendant Rutland to come to the Congress Inn to pick up his niece. That portion of the phone call was introduced without objection during the cross-examination of Defendant Williams by Defendant Rutland's counsel but excluded during the direct examination of Defendant Rutland. Only on "rare occasions" is a *question* hearsay. *See* Cohen, Sheppeard & Paine, *supra*, § 8.01 [10] n.34 (emphasis added). If the record does not suggest that a question was intended as an assertion, the question is not a "statement" for the purposes of hearsay. *See State v. Flood*, 219 S.W.3d 307, 314-15 (Tenn. 2007). Thus, the portion of the phone call contents that consisted of a question by Defendant Williams asking Defendant Rutland to pick up his niece is not hearsay.

It was this question that Defendant Rutland wanted the jury to hear to support his reasoning for being at the Congress Inn in the first place – to pick up a child. The second portion of the statement, indicating that Defendant Rutland was told by Defendant Williams that "something is fixing to go down," presented Defendant Rutland with a problem. By the end of the trial, both statements were known to the jury.

It is clear from the record that the portion of the content of the phone call between Defendants Williams and Rutland where Defendant Williams mentions that something is "fixing to go down" meets the first piece of the hearsay definition. It is a statement and the phone call was not made by the declarant during his testimony at the trial. However, the "fixing to go down" portion of the content of the phone call does not fit within the second part of the definition of hearsay. It is obvious from the record that the content of the phone call was not being "offered in evidence to prove the truth of the matter asserted." Rather, the record shows that the content of the phone call was being elicited by Defendant Rutland's counsel to show an effect on Defendant Rutland.

Both times that the content of the phone call was brought up on direct examination, it was in response to a question asking for an explanation of Defendant Rutland's actions. The record shows that the content of the phone call is the reason why Defendant Rutland initially went to the Congress Inn and why he waited for Defendant Williams at the Congress Inn. The State inquired about the content of the phone call on cross-examination of Defendant Rutland and revealed that the content contained a message that something was "fixing to go down." The content of the phone call had probative value outside of any assertion in the statements. Unless these statements were being offered on direct examination to prove that something was indeed "fixing to go down," they would not be offered for the truth of the matter asserted. The timing and context in which the content of the phone call was brought up illustrates that these statements were not being offered for the truth of the matter asserted, and they were not hearsay.

Error by the trial court does not automatically entitle Defendant Rutland to relief. Defendant Rutland's counsel was able to address the contents of the phone call during her cross-examination of Defendant Williams and re-direct examination of Defendant Rutland. Also, Defendant Rutland's counsel used the contents of the phone call during her closing argument. The jury got to hear that Defendant Rutland was asked to pick up his niece and that he knew that something was about to go down. It appears that Defendant Rutland asserts in his brief that he was prejudiced because the State was allowed to bring up the contents of the phone call on cross-examination after it had been excluded on his direct examination. While being impeached usually has some prejudicial effect on the jury's view of a witness's testimony, we do not agree with Defendant Rutland's argument that it created the appearance that something was hidden from the jury during Defendant Rutland's direct examination. If anything, it would appear that the State was trying to hide information because the State objected. Thus, we determine it is more probable that the error did not have a substantial and injurious impact on the jury's decision making. *See also State v. Rodriguez*, 254 S.W.3d 361, 373-74 (Tenn. 2008) (holding that harmless error exists only where it is more probable than not that the error affected the verdict or judgment); Tenn. R. App. P. 36(b). Accordingly, the trial court's error was harmless.

It is hard to see how Defendant Rutland could have been denied the ability to present a defense, when the content of the phone call was introduced elsewhere during the trial and used in closing argument. Looking to the factors from *State v. Flood*, the introduction of the content of the phone call on Defendant Rutland's direct examination was not critical because it was entered elsewhere. *See State v. Flood*, 219 S.W.3d 307, 316-19 (Tenn. 2007) (setting forth the factors to be considered on a right to present a defense issue as (1) whether the excluded evidence is critical to the defense; (2) whether the evidence bears sufficient indicia of reliability; and (3) whether the interest supporting exclusion of the evidence is substantially important.) Even though the statements were made in a telephone conversation between the Defendants in this case, one indicium of reliability is present because, at different points in the trial, both parties wanted to admit the statements. *Id.* However, this indicium of reliability is slight and merely renders the factor neutral. Even if the trial court erred, the lack of an interest supporting exclusion does not overcome the shortcomings on the other two factors. The noncritical nature of the evidence heavily outweighs the neutrality of its reliability and the lack of an interest supporting exclusion. Thus, Defendant Rutland's right to present a defense was hardly affected by the exclusion of the phone call's contents during his direct examination.

## II. Sufficiency of the Evidence

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and

replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973)). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### A. Defendant Williams's Aggravated Robbery Conviction

As charged in this case, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

Viewed in a light most favorable to the State, the evidence shows that Defendant Williams pointed a loaded silver revolver to Mr. Anderson's head and took around $400 from him along with Mr. Anderson's car keys. While Defendant Williams maintains that he did not have the intent to rob Mr. Anderson and that he did not take anything, Mr. Anderson and Ms. Howard testified that Defendant Williams took money from Mr. Anderson. Also, Mr. Anderson testified that Defendant Williams took his car keys. As we have reiterated time and time again, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury.

- 13 -

*State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A rational juror could have found that Defendant Williams used a deadly weapon to intentionally or knowingly deprive Mr. Anderson of approximately $400 and his car keys. Thus, the evidence is sufficient to support Defendant Williams's conviction for aggravated robbery.

## B. *Defendant Rutland's Criminal Responsibility*

Defendant Rutland challenges the sufficiency of the evidence for his convictions under a theory of criminal responsibility. As the State points out, Defendant Rutland does not deny that an aggravated robbery and aggravated assault occurred. Defendant Rutland merely argues that he did not possess the intent to promote or assist in the commission of the offenses committed by Defendant Williams. The State argues that the circumstantial evidence presented at trial established that Defendant Rutland had the intent to promote or assist Defendant Williams in the commission of the offense. We agree with the State.

A defendant can be criminally responsible "for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). In *State v. Dickson*, our supreme court explained:

> Criminal responsibility is not a separate crime, but "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility represents a legislative codification of the common law theories of aiding and abetting and accessories before the fact. *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).

413 S.W.3d 735, 744 (Tenn. 2013). Accordingly, "defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *Carson*, 950 S.W.2d at 954).

Viewed in a light most favorable to the State, the evidence shows that Defendant Rutland was standing outside with Defendant Williams at the time that Mr. Anderson and Ms. Howard pulled into the parking lot. Shortly after Defendant Williams approached

Mr. Anderson with the gun, Defendant Rutland approached Ms. Howard, asked for her cellphone, and told her not to move. While Defendant Rutland prevented Ms. Howard from going anywhere, Defendant Williams turned and pointed a loaded firearm at Ms. Howard, placing her in fear for her life. Defendant Rutland admitted that the purpose for his actions was to prevent Ms. Howard from calling the police because he did not want to be arrested nor did he want to see Defendant Williams arrested. The security video quite obviously shows that Defendant Rutland was more than a passive observer of the aggravated robbery and aggravated assault. Relying on inferences from the circumstantial evidence, a rational juror could find that Defendant Williams acted with the intent to promote or assist Defendant Williams in the commission of the crimes and that his actions of demanding Ms. Howard's cellphone and preventing her from moving away from the car aided Defendant Williams in the commission of the offense. The evidence is sufficient to support Defendant Rutland's convictions of aggravated robbery and aggravated assault under a theory of criminal responsibility.

### III. Sentencing

Defendant Rutland argues that the trial court erred when it sentenced him to an identical sentence as Defendant Williams. Further, he claims that the sentence was disproportionate and excessive for the offense and in contradiction with the Sentencing Act of 1989. The State responds by arguing that the trial court acted within its discretion. We agree with the State.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any

statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). Appellate courts may not disturb the sentence even if we had preferred a different result. *See id.* at 346.

At the sentencing hearing, Defendant Rutland's allocution expressed his remorse. However, the trial court found that no mitigating factors applied to Defendant Rutland. Rather, the trial court found four enhancement factors were applicable. This is the same amount of enhancement factors that were applied in Defendant Williams's sentencing. The trial court found Defendant Rutland was a Range I, standard offender and imposed a sentence of eleven years for his Class B felony, aggravated robbery conviction, which is within the appropriate range and is presumed reasonable. *See* T.C.A. § 40-35-112(a)(2) (listing sentencing range of "not less than eight (8) nor more than twelve (12) years" for a Class B felony); T.C.A. § 39-13-402(b) (listing aggravated robbery as a Class B felony). The trial court imposed a Range I sentence of five years for his Class C felony, aggravated assault conviction. *See* T.C.A. § 40-35-112(a)(3) (listing sentencing range of "not less than three (3) nor more than six (6) years" for a Class C felony); T.C.A. § 39-13-102(e)(1)(A)(iii) (listing aggravated assault, as charged in this case, as a Class C felony). Defendant Rutland argues that his sentence should be less than Defendant Williams's sentence because he played a lesser role in the crime but the security video alone belies this position. Defendant Rutland has failed to show that the trial court abused its discretion.

*Conclusion*

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE